**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ERIC THEISE, Derivatively on Behalf of Nominal Defendant,
AMPIO PHARMACEUTICALS, INC.,

       Plaintiff,

v.

RICHARD B. GILES,
PHILIP H. COELHO,
DAVID R. STEVENS,
MICHAEL MACALUSO, and
DAVID BAR-OR,

       Defendants,

-and-

AMPIO PHARMACEUTICALS, INC., a Delaware Corporation,

       Nominal Defendant.

_____

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**
_____

Plaintiff Eric Theise ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Ampio Pharmaceuticals, Inc. ("Ampio" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Ampio with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of Ampio against certain of its officers and directors seeking to remedy the Director Defendants' (as defined below) breach of fiduciary duties and corporate waste that occurred from December 14, 2017 through the present (the "Relevant Period") and have caused substantial harm to Ampio.

2. Ampio is a biopharmaceutical company focused primarily on the development of therapies to treat prevalent inflammatory conditions for which there are limited treatment options. Ampio's two lead product candidates in development are Ampion for osteoarthritis of the knee and Optina for diabetic macular edema.

3. Ampion is a non-steroidal, low molecular weight, anti-inflammatory biologic. The Company is developing Ampion as an intra-articular injection to treat the signs and symptoms of severe osteoarthritis of the knee ("OAK").

4. Ampio is seeking to bring Ampion to market through a Biologics License Application ("BLA"). The Biologics License Application (BLA) is a request for permission to introduce, or deliver for introduction, a biologic product into interstate commerce (21 CFR 601.2). The BLA is

regulated under 21 CFR 600 – 680.

5.      The BLA process includes (but is not limited to) the requirement of completing certain clinical trials.  For Ampion, the FDA required that the Company complete two (2) pivotal clinical trials.  Ampio identified these two (2) pivotal clinical trials as AP-003-A and AP-003-C.

6.      On December 14, 2017, Ampio published a press release and announced that its Phase 3 trial, AP-003-C, was successful, meeting both its primary and secondary endpoints.

7.      On August 7, 2018 Ampio filed an 8-K with the SEC attaching an Updated Business Disclosure.  In this disclosure, Ampio revealed for the first time that the FDA found that the AP-003-A, as a single trial does not appear to provide sufficient evidence of effectiveness to support a BLA, and the FDA does not consider the AP-003-C trial to be an adequate and well-controlled clinical trial.

8.      On this news, shares of Ampio fell $2.25 per share or over 78% to close at $0.61 per share on August 8, 2018. Shares continued to fall another 21.3% the next day.

9.      Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the FDA would find Ampio's AP-003-C Phase 3 clinical trial inadequate and not well-controlled; (2) therefore, Ampio had not successfully completed two pivotal clinical trials for Ampion; (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

## JURISDICTION

10.      This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.     Venue is proper in this Court because the Company maintains its executive office in this county, a substantial portion of the transactions and wrongs complained of herein occurred in this county, and the Director Defendants have received substantial compensation in this county by doing business here and engaging in numerous activities that had an effect in this county.

## THE PARTIES

### Plaintiff

12.     **Plaintiff Eric Theise** is, and was at relevant times, a shareholder of Ampio.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of Florida.

### Nominal Defendant

13.     **Nominal Defendant Ampio** is a biopharmaceutical research and development company.  Ampio is a Delaware Corporation headquartered in Englewood, Colorado.

### Director Defendants

14.     **Defendant Richard B. Giles** ("Giles") has been a member of the Company's Board of Directors since August 2010.  Giles is a member of the Audit Committee, the Nomination and Governance Committee, and the Compensation Committee.  Upon information and belief, Giles is a citizen of Colorado.

15.     **Defendant Philip H. Coelho** ("Coelho") has been a member of the Company's Board since April 2010.  Coelho is a member of the Audit Committee, the Nomination and Governance Committee, and the Compensation Committee.  Upon information and belief, Coelho is a citizen of California.

16.     **Defendant David R. Stevens** ("Stevens") has been a member of the Company's Board since June 2011.  Stevens is a member of the Audit Committee, the Nomination and Governance

Committee, and the Compensation Committee.   Upon information and belief, Stevens is a citizen of Colorado.

17.     **Defendant Michael Macaluso** ("Macaluso") has been the Company's Chief Executive Officer since January 9, 2012, and one of its Directors since March 2010.   Upon information and belief, Macaluso is a citizen of Colorado.

18.     **Defendant David Bar-Or** ("Bar-Or") has been the Company's Chief Scientific Officer and a Director since March 2010.   On September 4, 2018, Bar-Or announced that he was retiring from his position as Chief Science Officer, effective September 30, 2018, but was remaining as a Director and on the Scientific Advisory Board of Ampio.   Upon information and belief, Bar-Or is a citizen of Colorado.

19.     Defendants Giles, Coelho, Stevens, Macaluso, and Bar-Or are herein referred to as the "Director Defendants."

## AMPIO'S CORPORATE GOVERNANCE

20.     As members of Ampio's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

21.     Ampio maintains a Code of Business Conduct and Ethics ("Code of Conduct").   On information and belief, this Code of Conduct was most recently updated in 2017.   It states in relevant part:

**2. Purpose**

The Code seeks to deter wrongdoing and to promote:

Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

Full, fair, accurate, timely and understandable disclosure in reports and

documents that Ampio files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by Ampio;

### 3. Compliance With Applicable Laws, Rules and Regulations

Obeying the law is the foundation on which Ampio's ethical standards are built. You must comply with applicable laws, rules and regulations. Although you are not expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors or other appropriate personnel.

### 4. Compliance at Ampio

Ampio has established a structured compliance system to support legal and ethical actions throughout the Company. Compliance with this policy will be led by the Chief Financial Officer and the Nominating and Governance Committee, but the responsibility for compliance is shared by all employees. The Chief Financial Officer will be responsible for overseeing the Ampio compliance system, including maintaining current policies, conducting training, auditing, monitoring, testing, communication, investigations and enforcement. The Chief Financial Officer will provide oversight for compliance strategy and keep the Board and the Nominating and Governance Committee informed of significant compliance issues, risks and trends.

\*       \*       \*

### 6. Public Disclosure of Information

The federal securities laws require Ampio to disclose certain information in various reports that the Company must file with or submit to the SEC. In addition, from time to time, Ampio makes other public communications, such as issuing press releases.

Ampio expects all directors, officers and employees who are involved in the preparation of SEC reports or other public documents to ensure that the information disclosed in those documents is complete, fair, accurate, timely and understandable.

To the extent that you reasonably believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should report those concerns to the Chair of Ampio's Audit Committee.

\*       \*       \*

### 14. Regulatory Requirements

Ampio follows all applicable laws governing the manufacturing and distribution of drugs, devices and biological products. In particular, we observe all requirements of the U.S. Food and Drug Administration (the "FDA"), and we expect every employee to do likewise at all times.

These requirements affect employees who work inside and outside the U.S. alike, as many FDA requirements apply outside of national boundaries. While there are many

FDA regulations to consider, regulation of advertising and promotion directly affects our everyday communications. Therefore, all employees are obligated to understand the basic rules with respect to labeling, promotion, off-label use, pharmaceutical samples, and adverse event reporting. As a pharmaceutical company, Ampio is also subject to many healthcare rules and regulations designed to protect the public….

1.      Ampio's Disclosure Committee Charter provides in relevant part:

## I. General Statement of Purpose

The purposes of the Disclosure Committee of Ampio Pharmaceuticals, Inc. (the "Company") are to assist and report to the Company's chief executive officer and chief financial officer (the "Senior Officers") in establishing, implementing, maintaining and evaluating controls or other procedures designed to ensure:

1. that the information that the Company is required to disclose in the Company's reports furnished or filed under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), including but not limited to certain material information about the Company, its products, scientific issues such as the status of clinical trials, compliance issues, and regulatory issues, is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission ("SEC") rules and forms in an accurate and complete manner; and

2. that such information is accumulated and communicated to the Company's Senior Officers, as appropriate, to allow timely decisions regarding required disclosure.

## II. Responsibilities and Authority

The principal activities of the Disclosure Committee will generally include the following:

1. Design, adopt and maintain appropriate procedures and standards that are designed to ensure that: (i) information required by the Company to be disclosed to the SEC, and other written information that the Company will disclose to the public is recorded, processed, summarized and reported accurately and on a timely basis; (ii) risks and risk factors are adequately disclosed; and (iii) such information is accumulated and communicated to the Company's management, including the Company's Senior Officers, as appropriate, to allow timely decisions regarding required disclosure (the "Disclosure Controls").

2. Monitor the integrity and evaluate the effectiveness of the Disclosure Controls.

3. Review the Company's: (i) Annual Report on Form 10-K, Quarterly

Reports on Form 10-Q, and Current Reports on Form 8-K, proxy statement, material registration statements, and any other information filed with the SEC; (ii) press releases containing financial information, earnings guidance, information about material developments, or other information material to the Company's security holders; and (iii) correspondence broadly disseminated to shareholders and all presentations to analysts and the investment community (collectively, the "Covered Reports").

4. Discuss with the Senior Officers all relevant information relative to the Disclosure Committee's responsibilities and proceedings, including: (i) the preparation of the Company's disclosures in the Covered Reports; (ii) the evaluation of the effectiveness of the Disclosure Controls; and (iii) any false statement or omission of material fact discovered upon review of a Covered Report.

*     *     *

### III. Organization of Disclosure Committee

The members of the Disclosure Committee are appointed from time to time by the Senior Officers. The Disclosure Committee shall initially be comprised of the Company's Chief Financial Officer and at least two of the following: the Company's president, chief executive officer, general counsel, chief technology officer, one independent member of the Board and other key accounting/auditing, business, risk management, investor relations and financial personnel involved in preparing the Covered Reports. The Senior Officers may change the composition of the Disclosure Committee from time to time. Notwithstanding the foregoing, the Senior Officers at their option may at any time assume any or all of the responsibilities of the Disclosure Committee identified in this Charter, including, for example, approving the periodic reports and other disclosure documents when time does not permit the full Committee to meet and discharge its duties.

*     *     *

22. Ampio's Disclosure Committee Charter does not appear on Ampio's website. On information and belief, this charter is not mentioned or attached to any document Ampio filed with the SEC, including but not limited to its various 10-K's, Def 14A's, and 8-K's. A copy of Ampio's Disclosure Committee Charter is attached hereto as Exhibit A.

23. Ampio's Nominating and Governance Committee Charter provides in relevant part:

### I. Purpose

The purpose of the Nominating and Governance Committee (the "Committee") of the Board is to assist the Board in discharging the Board's responsibilities regarding: … (d) the development and recommendation to the Board of a set of corporate

8

governance policies and principles applicable to the Company (the "Corporate Governance Policies").

\* \* \*

### IV. Duties and Responsibilities

\* \* \*

11. The Committee shall, at least annually, evaluate the performance of the Chief Executive Officer in the area of corporate governance and report its findings to the Compensation Committee of the Board.

12. The Committee shall make recommendations to the Board regarding governance matters as appropriate, including, but not limited to, the Company's Code of Business Conduct and Ethics, certificate of incorporation or bylaws, this Charter and the charters of the Company's other committees.

\* \* \*

14. The Committee shall develop and recommend to the Board, and shall review on a periodic basis, the Corporate Governance Policies and the Company's Code of Business Conduct and Ethics.

\* \* \*

24.     Ampio's Audit Committee Charter provides in relevant part:

### I. Purpose

The purpose of the Audit Committee (the "Committee") is to assist the Board with its oversight responsibilities regarding: (i) the accounting and financial reporting processes of the Company, (ii) the integrity of the Company's financial statements; (iii) the Company's compliance with legal and regulatory requirements; (iv) the registered independent auditor's qualifications and independence; (v) the performance of the Company's internal audit function; (vi) the evaluation of the performance of the Company's registered independent auditor; and (vii) the audits of the Company's financial statements.

### IV. Powers and Responsibilities

\* \* \*

*8. Meetings with Management and the Registered Independent Auditor Concerning Earnings Releases and Other Matters.*

\* \* \*

(ii) The Committee shall discuss with management and the registered independent auditor any correspondence from or with regulators or governmental agencies, any employee complaints, or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or audit function.

\* \* \*

10. *Legal Matters*. The Committee shall discuss with the Company's general counsel, if any, or outside counsel any legal matters brought to the Committee's attention that

could reasonably be expected to have a material impact on the Company's financial statements.

*        *        *

16. *Code of Business Conduct and Ethics*. The Committee shall review on a periodic basis the Company's Code of Business Conduct and Ethics and provide the Board with any recommendations for amendments to the Code of Business Conduct and Ethics. The Committee shall have the authority to grant waivers of the Code of Business Conduct and Ethics for executive officers and directors.

17. *Reporting to the Board*. The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements and internal controls, the Company's compliance with legal, regulatory or financial reporting requirements, the performance and independence of the Company's registered independent auditor, the performance of the Company's internal audit function or any other matter the Committee determines is necessary or advisable to report to the Board.

## DUTIES OF THE DIRECTOR DEFENDANTS

25.      By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Ampio, the Director Defendants owed Ampio and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage Ampio in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of Ampio and its investors.

26.      Each director of the Company owes to Ampio and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

27.      To discharge their duties, the officers and directors of Ampio were required to

exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Ampio were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     Remain informed as to how Ampio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     Ensure that all decisions were the product of independent business judgment

and not the result of outside influences or entrenchment motives.

28.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ampio, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

29.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements as alleged herein.  As a result, Ampio has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## SUBSTANTIVE ALLEGATIONS

### Background and Materially False and Misleading Statements

30.     Ampio is a biopharmaceutical company focused primarily on the development of therapies to treat prevalent inflammatory conditions for which there are limited treatment options. One of its Ampio's limited inventory of product candidates in development is Ampion for osteoarthritis of the knee.

31.     Ampio is a non-steroidal, low molecular weight, anti-inflammatory biologic.  The Company is developing Ampion as an intra-articular injection to treat the signs and symptoms of severe osteoarthritis of the knee ("OAK").

32.     Ampio is seeking to bring Ampion to market through a Biologics License Application

("BLA").  The Biologics License Application (BLA) is a request for permission to introduce, or deliver for introduction, a biologic product into interstate commerce (21 CFR 601.2). The BLA is regulated under 21 CFR 600 – 680.

33.    The Center for Biologics Evaluation and Research ("CBER") is the Center within FDA that regulates biological products for human use under applicable federal laws, including the Public Health Service Act and the Federal Food, Drug and Cosmetic Act.

34.    The BLA process includes (but is not limited to) the requirement of completing certain clinical trials.  For Ampion, the FDA required that the Company complete two (2) pivotal clinical trials.  Ampio identified these complete two (2) pivotal clinical trials as AP-003-A and AP-003-C.

35.    On December 14, 2017 Ampio published a press release announcing that its Phase 3 trial (AP-003-C) was successful and met both its primary and secondary endpoints.  This press release, attached hereto as Exhibit B, states in relevant part:

**Ampio Pharmaceuticals Reports Positive Results for both Primary and Secondary Endpoints of Pivotal Phase 3 Trial of Ampion™ in Severe Osteoarthritis-of-the-Knee (OAK)**

*        *        *

**ENGLEWOOD, Colo., December 14, 2017** — Ampio Pharmaceuticals, Inc. (NYSE MKT: AMPE) today reported that the Phase 3 clinical trial of Ampion™ met its primary endpoint with 71% of Ampion™ treated patients meeting the OMERACT-OARSI responder criteria, which exceeds the physician reported threshold of 30% for a meaningful treatment in severe osteoarthritis of the knee (p < 0.001)….

If approved, Ampion™ would be the first intra-articular injection to treat the signs and symptoms of patients with severe osteoarthritis of the knee (Kellgren-Lawrence x-ray grade 4). In order to support a label for signs and symptoms, Ampion™ was asked to demonstrate clinical efficacy in a composite response of pain, function and be supported by quality of life.

Ampion™ was well tolerated with treatment-emergent adverse events (TEAEs) comparable to those of placebo in all single-injection studies of Ampion™. There were no drug-related serious TEAEs associated with the Ampion™ arm. The safety

and tolerability profile of Ampion™ is consistent with previous studies. To date, Ampion™ has been given to over 900 patients with no reported drug-related serious TEAEs.

Ampio plans to present a more detailed analysis of the Phase 3 and pooled data at an upcoming scientific meeting as well as submission for publication.

"We are very pleased with the positive Phase 3 data as we believe that Ampion™ will address an unmet medical need, providing severely diseased patients a non-opioid option that not only reduces pain, but also improves function and quality of life in a meaningful way" said Michael Macaluso, Chairman and CEO, Ampio Pharmaceuticals. "We are hopeful that Ampion™ will serve as a safe and effective treatment for an incurable, progressive disease that afflicts 21 million people in the U.S. and over 200 million people worldwide who suffer from osteoarthritis. We look forward to working closely with the U.S. Food and Drug Administration (FDA) as we prepare to submit our Biologics License Application (BLA) for Ampion™."

36.     On January 8, 2018 Ampio published a press release and filed a Form 8-K with the SEC. In the press release Defendant Macaluso stated in part, ""Now that Ampio has successfully completed the second of the two Phase III clinical trials required for a Biologics License Application (BLA) to the FDA, the Company will be updating the healthcare investment community on our progress [at the J.P. Morgan Healthcare Conference]…"  The 8-K attached as Exhibit 99.2 a presentation titled "Ampion™, Management Presentation, January 2018 (the"1/18 Presentation"). A copy of the 1/18 Presentation is attached as Exhibit C.

37.     The 1/18 Presentation states in relevant part:

- Ampion has successfully completed two pivotal studies required for BLA submission (at page 11)
- Ampio has a clear path to approval and incorporated FDA guidance when designing AP-003-C to maximize regulatory and commercial success (at page 11)
- Ampion has completed two pivotal studies required for FDA filing as well as several additional studies supporting efficacy as both a single and repeat injection (at page 12)
- AP-003-C successfully met its primary endpoint demonstrating statistically significant OARSI response vs. 30% threshold; provided Ampio its second successful pivotal study (at page 15)
- AP-003-C and AP-003-A provide two statistically significant clinical trials for BLA submission that demonstrate significant effect on pain and core OAK measurements

14

(at page 17)
- Ampion will be the first and only treatment indicated to address this unmet need (at page 22)

38.     On March 6, 2018 Ampio filed its annual report for the fiscal year ended December 31, 2017 on Form 10-K with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendant Macaluso and Ampio's Chief Financial Officer ("CFO"), Treasurer and Secretary, Thomas E. Chilcott III ("Chilcott"), and also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Macaluso and Chilcott. The 2017 10-K stated that the Company's "disclosure controls and procedures as of the end of the period covered by this report were effective."

39.     In the 2017 10-K, Ampio provided a status on Ampion and reported positive results for the AP-003-A and AP-003-C studies. In its 2017 10-K, Ampio stated in relevant part:

**SPRING Pivotal Trial (AP-003-A)**

In the second half of 2013, we announced the results of our positive single injection Phase III pivotal trial, the SPRING study. This study of Ampion focused on the treatment of pain due to osteoarthritis of the knee. The results of this study establish the safety and efficacy of Ampion for reduction of pain due to OA of the knee at 12 weeks after a single intra-articular injection....

                          *          *          *

*AP-003-C*

In December 2017, we reported positive results for both the primary and secondary endpoints of our confirmatory single injection Phase III clinical trial of 168 patients. The 12-week study evaluated the responder rate of Ampion-treated patients as defined by the Osteoarthritis Research Society International ("OARSI") Standing Committee for Clinical Trials Response Criteria Initiative (OMERACT), which included pain, function, and patient global assessment in support of a label for the treatment of the signs and symptoms of severe OAK. Ampion met its primary endpoint with 71% of Ampion treated patients meeting the OMERACT-OARSI responder criteria, which exceeds the physician reported threshold of 30% for a meaningful treatment in severe osteoarthritis of the knee. Responders experienced, on average, a 53% decrease in pain as measured by WOMAC A and a 50% improvement in function as measured by WOMAC C and a 45% improvement in quality of life as measured by Patient Global Assessment (PGA). In the secondary

endpoints, Ampion treated patients achieved statistical significance in a composite endpoint of pain and function from baseline in both categories at 12 weeks, which was supported by an increase in quality of life as measured by patient global assessment (PGA). When treated with Ampion, patients experienced significant improvement in a composite endpoint of pain and function compared to all severely diseased saline-treated patients in historical Ampion phase III clinical trials. We believe this data supports Ampion's ability to address an unmet medical need and provide patients with a meaningful, non-opioid treatment that improves pain, function and quality of life.

## The Truth Begins To Emerge

40.     On August 7, 2017 Ampio filed a Form 8-K with the SEC, which attached an Updated Business Disclosure as Exhibit 99.1.  A copy of the Updated Business Disclosure is attached hereto as Exhibit D.  In the Form 8-K, Ampio stated:

> As previously reported, Ampio Pharmaceuticals, Inc. (the "Company") met with the U.S. Food and Drug Administration (the "FDA") in July 2018 to continue their discussions on the BLA submission being prepared for Ampion™ as a treatment of the signs and symptoms of severe (KL 4) osteoarthritis of the knee (OAK) and received a letter from the FDA with respect thereto. Accordingly, the Company is filing this information with this Current Report on Form 8-K for the purpose of updating the description of certain aspects of its business from the disclosure contained in the Company's prior filings with the SEC, including the Company's most recent Annual Report on Form 10-K for the year ended December 31, 2017, filed with the SEC on March 6, 2018. The updated disclosures are filed herewith as Exhibit 99.1 and are incorporated herein by reference.

41.     Of note, neither the Form 8-K or Updated Business Disclosure reveals the date of the FDA letter to Ampio where it stated that "…it does not consider the AP-003-C trial to be an adequate and well-controlled clinical trial."

42.     On this news, shares of Ampio fell $2.25 per share or over 78% to close at $0.61 per share on August 8, 2018. Shares continued to fall another 21.3% the next day.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

43.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of

fiduciary duties and corporate waste by the Director Defendants.

44.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

45.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and are prepared to do so.

46.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

47.     The Company Board is currently comprised of five (5) members – Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, three (3), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

48.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

49.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

50.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

51.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act

52.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**The Individual Defendants Are Not Independent or Disinterested**

**Defendant Macaluso**

53.     Defendant Macaluso is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Macaluso (as Chief Executive Officer) is an employee of the Company who derives substantially all of his income from his employment with Ampio, making him not independent.  As such, Defendant Macaluso cannot independently consider any demand to sue himself for breaching his fiduciary duties to Ampio, because that would expose him to liability and threaten his livelihood.

54.     Accordingly, Defendant Macaluso lacks independence from Defendants Giles, Coelho, and Stevens, defendants who are not disinterested and who exert influence over defendant

Macaluso's compensation by virtue of their positions as representing the entire Compensation Committee.

55.     This lack of independence and financial benefits received by Defendant Macaluso renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

56.     Further, Defendant Macaluso received from the Company $1.55 million in compensation in 2014, including stock options valued at $1.10 million, and $376,000 thousand in 2013.  He beneficially owns 4.8%, or 2,549,000 shares, of Company common stock. As the leader of the Company who was the most responsible for the Company's fraud, and as the maker of the false and misleading statements of material fact as alleged herein, Defendant Macaluso breached his fiduciary duties.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Macaluso knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.

57.     Finally, Ampio acknowledges that Defendant Macaluso is not independent in its Form DEF 14A filed with the SEC on August 29, 2017.

**Defendant Bar-Or**

58.     Defendant Bar-Or is the Company's Chief Scientific Officer (until September 30, 2018) and a Company Director, and thus, is a non-independent Director.  In 2014, Bar-Or received from the Company $1.84 million in compensation, including stock options valued at $1.54 million. In 2013, Bar-Or received from the Company $924 thousand in compensation, including stock options valued at $469 thousand.  Defendant Bar-Or beneficially owns 1.9%, or 1,033,333 shares, of Company common stock.  Accordingly, Defendant Bar-Or lacks independence from Defendants Giles, Coelho, and Stevens, defendants who are not disinterested and who exert influence over

defendant Bar-Or's compensation by virtue of their positions as representing the entire Compensation Committee.

59.     Also, Ampio acknowledges that Defendant Bar-Or is not independent in its Form DEF 14A filed with the SEC on August 29, 2017.

**Defendant Giles**

60.     Defendant Giles is a member of the Audit Committee, the Nomination and Governance Committee, and the Compensation Committee.  Defendant Giles received from the Company $400,000 in compensation in 2014, including stock options valued at $306,000. Defendant Giles received from the Company $294,000 in compensation in 2013, including stock options valued at $210,000.  Defendant Giles beneficially owns 1.7%, or 880,481 shares, of Company common stock.  In August 2010, Defendant Giles loaned the Company $100,000.  Further, in August 2010, Defendants Macaluso and Giles, together with an affiliate of Defendant Giles, purchased convertible debentures from us for $430,000.  The debentures were issued in principal amounts of $230,000, $100,000 and $100,000, respectively, to Macaluso, Giles, and James A. Ludvik.  Ludvik is the sole owner of Ludvik Electric Co., for which Defendant Giles serves as the Chief Financial Officer.  The debentures accrued interest at the rate of 8% per annum.  The principal and accrued interest of the debentures were converted into Company common stock at a conversion price of $1.75 per share on February 28, 2011, on the same terms under which convertible debentures issued to non-affiliates were converted.

61.     As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Defendant Giles knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  As a result of Defendant Giles' substantial equity interest in the Company, the substantial income he received from the Company,

and the related-party transaction that he engaged in with the Company, Defendant Giles is beholden to Macaluso and other Officer Defendants and has a vested interest in causing the Company stock price to be as high as possible.

## Defendant Coelho

62.     Defendant Coelho is a member of the Audit Committee, the Nomination and Governance Committee, and the Compensation Committee.   He received from the Company $241,000 in compensation in 2014, including stock options valued at $133,000.  Defendant Coelho received from the Company $93,000 thousand in compensation in 2013.   Defendant Coelho beneficially owns 1.1%, or 573,414 shares, of Company common stock.

63.     Defendant Coelho knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  As a result of his substantial equity interest in the Company and his substantial income received from the Company, Defendant Coelho is beholden to Macaluso and other Officer Defendants and has a vested interest in causing the Company stock price to be as high as possible.  Thus, as Defendant Coelho is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

## Defendant Stevens

64.     Defendant Stevens is a member of the Audit Committee, the Nomination and Governance Committee, and the Compensation Committee.  Defendant Stevens received from the Company $71,000 in compensation in 2014. Defendant Stevens received from the Company $61,000 in compensation in 2013.   Defendant Stevens beneficially owns 0.4%, or 222,922 shares, of Company common stock.

**All Director Defendants**

65.     On information and belief, all Director Defendants failed to create Ampio's Disclosure Committee and implement the terms of its Charter, as required by the terms of the settlement entered into by the Company and the Director Defendants and approved by the Court in its final judgment on June 28, 2017 and in that action commonly known as *Oglina v. Macaluso, et al.*, Case Number 2:15-cv-5970 (U.S.D.C., Central District, Western Division).

66.     This Disclosure Committee, and its responsibilities as described in its charter, directly addresses the wrongful conduct as alleged herein.  The Director Defendants apparent failures to comply with the terms of this settlement further evidence that any demand on the Board would be futile.

## FIRST CAUSE OF ACTION

### Against The Director Defendants for Breach of Fiduciary Duties

67.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

68.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

69.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

70.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the adequacy of Company's Ampion clinical trials.  These actions could not have been a good faith exercise of

prudent business judgment to protect and promote the Company's corporate interests.

71.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

72.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against The Director Defendants for Waste of Corporate Assets

73.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

74.     The Director Defendants knowingly, intentionally, recklessly, or negligently breached their fiduciary duties and, thereby, caused the Company to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which Ampio has been and continues to be substantially damaged.

75.     In light of their deficient performance in supervising controls and financial affairs of the Company, the Director Defendants have wasted corporate assets by overly compensating themselves and the Company's executives during times when the Company was materially misstated its performance to the investing public.

76.     Accordingly, the Director Defendants should be required to make the Company whole for such waste.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.      Declaring that the Director Defendants have breached their fiduciary duties and participated and/or aided and abetted the breach of their fiduciary duties as alleged herein;

C.      Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

D.      Declaring that the Director Defendants wasted corporate assets by, among other things, overcompensating themselves at a time when they knew the Company was materially misrepresenting the adequacy of its clinical trials and its financial health and that the Company had materially deficient internal controls over these matters;

E.      Directing the Director Defendants, jointly and severally, to account for all losses and/or damages sustained by Ampio by reason of the acts and omissions complained of herein;

F.      Requiring the Director Defendants to remit to Ampio all of their salaries and other compensation received for the periods when they breached their duties;

G.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

H.      Awarding pre-judgment and post-judgment interest as allowed by law;

I.      Awarding to Plaintiff's the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  October 5, 2018                Respectfully submitted,


                                       /s/ *Jeffrey A. Berens*
                                       Jeffrey A. Berens
                                       BERENS LAW LLC
                                       2373 Central Park Boulevard, Suite 100
                                       Denver, Colorado 80238
                                       Telephone: (303) 861-1764
                                       Facsimile: (303) 395-0393
                                       Email: jeff@jberenslaw.com

                                       *Local Counsel for Plaintiff*

                                       GAINEY McKENNA & EGESTON
                                       Thomas J. McKenna
                                       440 Park Avenue South, 5th Floor
                                       New York, New York 10016
                                       Telephone: (212) 983-1300
                                       Facsimile: (212) 983-0383
                                       Email: tjmckenna@gme-law.com

                                       *Counsel for Plaintiff*

## VERIFICATION

I, ERIC THEISE, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Ampio Pharmaceuticals, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Ampio Pharmaceuticals, Inc. common stock at all relevant times.

9/28/18
Date

ERIC THEISE

Exhibit A

*Proposed Document*

**AMPIO PHARMACEUTICALS, INC.**
**DISCLOSURE COMMITTEE CHARTER**

*Proposed Document*

# AMPIO PHARMACEUTICALS, INC.
# DISCLOSURE COMMITTEE CHARTER

**(Adopted \_\_\_\_\_, 2017)**

## I.   
**General Statement of Purpose**

The purposes of the Disclosure Committee of Ampio Pharmaceuticals, Inc. (the "Company") are to assist and report to the Company's chief executive officer and chief financial officer (the "Senior Officers") in establishing, implementing, maintaining and evaluating controls or other procedures designed to ensure:

1.   that the information that the Company is required to disclose in the Company's reports furnished or filed under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), including but not limited to certain material information about the Company, its products, scientific issues such as the status of clinical trials, compliance issues, and regulatory issues, is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission ("SEC") rules and forms in an accurate and complete manner; and

2.   that such information is accumulated and communicated to the Company's Senior Officers, as appropriate, to allow timely decisions regarding required disclosure.

## II.   **Responsibilities and Authority**

The principal activities of the Disclosure Committee will generally include the following:

1.   Design, adopt and maintain appropriate procedures and standards that are designed to ensure that: (i) information required by the Company to be disclosed to the SEC, and other written information that the Company will disclose to the public is recorded, processed, summarized and reported accurately and on a timely basis; (ii) risks and risk factors are adequately disclosed; and (iii) such information is accumulated and communicated to the Company's management, including the Company's Senior Officers, as appropriate, to allow timely decisions regarding required disclosure (the "Disclosure Controls").

2.   Monitor the integrity and evaluate the effectiveness of the Disclosure Controls.

3.   Review the Company's: (i) Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K, proxy statement, material registration statements, and any other information filed with the SEC; (ii) press releases containing financial information, earnings guidance, information about material developments, or other information material to the Company's security holders; and (iii) correspondence broadly disseminated to shareholders and all presentations to analysts and the investment community (collectively, the

*Proposed Document*

"Covered Reports").

4.      Discuss with the Senior Officers all relevant information relative to the Disclosure Committee's responsibilities and proceedings, including: (i) the preparation of the Company's disclosures in the Covered Reports; (ii) the evaluation of the effectiveness of the Disclosure Controls; and (iii) any false statement or omission of material fact discovered upon review of a Covered Report.

5.      Provide or oversee an annual mandatory training session to the Company's Board of Directors and employees, which shall include coverage of the following topics: (i) risk assessment and compliance, (ii) the Company's Code of Ethics, (iii) any and all manuals or policies established by the Company concerning legal or ethical standards of conduct to be observed in connection with work performed for the Company, and (iv) the obligations of the Disclosure Committee and the rules, regulations and other factors that impact disclosures contained in the Covered Reports. Upon completion of training, each person receiving the training shall provide a written certification as to his or her receipt and understanding of the obligations under the relevant Company policies.  Each written certification shall be maintained by the Disclosure Committee for a period of five (5) years from the date it was executed.

6.      The Disclosure Committee shall have such other responsibilities, consistent with the Disclosure Committee's purpose, as any Senior Officer may assign to it from time to time.

## III.    <u>Organization of Disclosure Committee</u>

The members of the Disclosure Committee are appointed from time to time by the Senior Officers.  The Disclosure Committee shall initially be comprised of the Company's Chief Financial Officer and at least two of the following: the Company's president, chief executive officer, general counsel, chief technology officer, one independent member of the Board and other key accounting/auditing, business, risk management, investor relations and financial personnel involved in preparing the Covered Reports.  The Senior Officers may change the composition of the Disclosure Committee from time to time.  Notwithstanding the foregoing, the Senior Officers at their option may at any time assume any or all of the responsibilities of the Disclosure Committee identified in this Charter, including, for example, approving the periodic reports and other disclosure documents when time does not permit the full Committee to meet and discharge its duties.

The Disclosure Committee's chairperson will be designated by the Chief Financial Officer or, if he does not do so, the members of the Disclosure Committee will elect a chairperson by a vote of the majority of the full Disclosure Committee.

The Company's external legal counsel may serve as counsel to the Disclosure Committee but will not be a member thereof and will not have the right to vote at Disclosure Committee meetings. The Disclosure Committee will be assisted in the performance of its duties by appropriate management, operational, legal and financial personnel from the Company (*i.e.*,

*Proposed Document*

internal audit, risk management, legal and accounting). These personnel will assist in the preparation and review of disclosure within their particular areas of operation, expertise or competence, as the case may be, and will be available for such other support functions as members of the Disclosure Committee may determine are necessary or appropriate in the fulfillment of their duties. In addition, the lead audit partner (or such lead audit partner's designee) of the Company's independent registered public accounting firm may be called on to participate in Disclosure Committee meetings as needed but shall not have the right to vote at Disclosure Committee meetings.

## IV.    <u>Meetings and Procedures</u>

The Disclosure Committee shall meet at least quarterly to fulfill its responsibilities as described in this Charter.   The Disclosure Committee shall adopt, whether formally or informally, such procedures as it deems necessary to facilitate the fulfillment of its responsibilities.

## V.    <u>Full Access</u>

The Disclosure Committee shall have full access to all of Company's books, records, assets, facilities and personnel, including the internal auditors, in connection with fulfilling its responsibilities.

Exhibit B

## Ampio Pharmaceuticals Reports Positive Results for both Primary and Secondary Endpoints of Pivotal Phase 3 Trial of Ampion™ in Severe Osteoarthritis-of-the Knee (OAK)

- Primary endpoint of OMERACT-OARSI responder rate at 12 weeks achieved statistical significance (p < 0.001)
- Ampion™ is the first therapy indicated for signs and symptoms for severe osteoarthritis of the knee and will address a signific
- Conference call, December 14, at 6:30 a.m. MT (8:30 ET)

**ENGLEWOOD, Colo., December 14, 2017** — Ampio Pharmaceuticals, Inc. (NYSE MKT: AMPE) today reported that the Phase 3 clinical trial of Ampion™ met its primary endpoint with 71% of Ampion™ treated patients meeting the OMERACT-OARSI responder criteria, which exceeds the physician reported threshold of 30% for a meaningful treatment in severe osteoarthritis of the knee (p < 0.001). Responders experienced, on average a 53% decrease in pain as measured by WOMAC A and a 50% improvement in function as measured by WOMAC C and a 45% improvement in quality of life as measured by Patient Global Assessment (PGA). In the secondary endpoints, Ampion™ treated patients achieved statistical significance in a composite endpoint of pain and function from baseline in both categories at 12 weeks (p < 0.001), which was supported by an increase in quality of life as measured by patient global assessment (PGA) (p < 0.001). When treated with Ampion™ (n=144), patients experienced significant improvement in a composite endpoint of pain and function compared to all KL 4 saline-treated patients (n=206) in Ampion™ phase 3 clinical trials (p < 0.001).

If approved, Ampion™ would be the first intra-articular injection to treat the signs and symptoms of patients with severe osteoarthritis of the knee (Kellgren-Lawrence x-ray grade 4). In order to support a label for signs and symptoms, Ampion™ was asked to demonstrate clinical efficacy in a composite response of pain, function and be supported by quality of life.

Ampion™ was well tolerated with treatment-emergent adverse events (TEAEs) comparable to those of placebo in all single-injection studies of Ampion™. There were no drug-related serious TEAEs associated with the Ampion™ arm. The safety and tolerability profile of Ampion™ is consistent with previous studies. To date, Ampion™ has been given to over 900 patients with no reported drug-related serious TEAEs.

Ampio plans to present a more detailed analysis of the Phase 3 and pooled data at an upcoming scientific meeting as well as submission for publication.

"We are very pleased with the positive Phase 3 data as we believe that Ampion™ will address an unmet medical need, providing severely diseased patients a non-opioid option that not only reduces pain, but also improves function and quality of life in a meaningful way" said Michael Macaluso, Chairman and CEO, Ampio Pharmaceuticals. "We are hopeful that Ampion™ will serve as a safe and effective treatment for an incurable, progressive disease that afflicts 21 million people in the U.S. and over 200 million people worldwide who suffer from osteoarthritis. We look forward to working closely with the U.S. Food and Drug Administration (FDA) as we prepare to submit our Biologics License Application (BLA) for Ampion™."



In this multi-center, randomized study of 144 KL4 patients with severe OAK of the knee, patients received either a single 4mL intra-articular injection of Ampion™ or placebo at a ratio of 6:1. The primary endpoint of responder analysis using OMERACT-OARSI was evaluated at 12-weeks following a single injection.

The OMERACT-OARSI response composite looks to assess three core symptoms of OAK (pain, function, and patient's global assessment) as a single variable. For each domain, a response requires both a relative and an absolute change. OMERACT-OARSI response is defined as having a high improvement in pain or function and/or a clinically meaningful improvement in two of three core measurements of OA: pain, function or quality of life. Specifically, to be considered a responder, a patient must demonstrate improvement in WOMAC A (pain) or WOMAC C (function) of ≥50% and absolute change of ≥1.0 point on a 5 point Likert (0-4) scale, or ≥20% improvement in at least 2 of the following 3 categories: WOMAC A, WOMAC C, or Patient Global Assessment, with a 0.5 point change on a 5 point (0-4) pain scale.

**Conference Call**

At 8:30 a.m. ET Ampio's management will host a conference call to discuss the Phase 3 clinical results. The dial-in number for the conference call is (877) 260-1479 for U.S./Canada participants and (334) 323-0522 for local participants, with Participant Passcode # 6638480. A live webcast of the conference call can also be accessed through the "Investors" tab on the Ampio Pharmaceuticals website at www.ampiopharma.com. A webcast replay will be available online after the call.

**About Osteoarthritis**

Osteoarthritis (OA) is an incurable and progressive disorder of the joints involving degradation of the intra-articular cartilage, joint lining, ligaments, and bone. The incidence of developing osteoarthritis of the knee over a lifetime is approximately 45%. As this disease is associated with age, obesity, and diabetes, this number will continue to grow. Certain risk factors in conjunction with natural wear and tear lead to the breakdown of cartilage. Osteoarthritis is caused by inflammation of the soft tissue and bony structures of the joint, which worsens over time and leads to progressive thinning of articular cartilage. Other symptoms include narrowing of the joint space, synovial membrane thickening, osteophyte formation and increased density of subchondral bone.

**About Ampio Pharmaceuticals**

Ampio Pharmaceuticals, Inc. is a development stage biopharmaceutical company primarily focused on the development of therapies to treat prevalent inflammatory conditions for which there are limited treatment options. We are developing compounds that decrease inflammation by (i) inhibiting specific pro-inflammatory compounds by affecting specific pathways at the protein expression and the transcription level; (ii) activating specific phosphatase or depletion of the available phosphate needed for the inflammation process; and (iii) decreasing vascular permeability.

**Forward-Looking Statements**

Ampio's statements in this press release that are not historical fact, and that relate to future plans or events, are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements can be identified by the use of words such as "believe," "expect," "plan," "anticipate," and similar expressions. These forward-looking statements include statements regarding Ampio's clinical trials of our Ampion™ product. The risks and uncertainties involved include those detailed from time to time in Ampio's filings with the Securities and Exchange Commission, including without limitation, under Ampio's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q.



Ampio undertakes no obligation to revise or update these forward-looking statements, whether as a result of new information, future events or otherwise.

**Company Contact**
Tom Chilcott
ChiefFinancialOfficer
Phone:(720)437-6500
tchilcott@ampiopharma.com

**Media Contact**
Chiara Russo
Director, Investor Relations
Lavoie Health Science
Phone: (617) 374-8800 ext. 112
crusso@lavoiehealthscience.com

Exhibit C



*Ampion™*

**Management Presentation
January 2018**

# Forward-Looking Statement

These slides and materials, including any accompanying oral presentation, contain forward-looking statements about our business. You should not place undue reliance on forward-looking statements as these statements are based upon our current expectations, forecasts and assumptions and are subject to significant risks and uncertainties. These statements may be identified by words such as "may," "will," "should," "could," "expect," "intend," "plan," "anticipate," "believe," "estimate," "predict," "potential," "forecast," "continue" or the negative of these terms or other words or terms of similar meaning. Risks and uncertainties that could cause our actual results to differ materially from those set forth in any forward-looking statements include, but are not limited to, the matters listed under "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2016, which is on file with the Securities and Exchange Commission, as well as other risks detailed in our subsequent filings with the Securities and Exchange Commission. These reports are available at [www.sec.gov](www.sec.gov).

Statements and information, including forward-looking statements, speak only to the date they are provided (unless an earlier date is indicated), and we do not undertake any obligation to publicly update any statements or information, including forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.



## Executive Summary

- Ampion™ is a novel biologic set to address an unmet medical need and significant treatment gap in severe osteoarthritis of the knee (OAK)
  - FDA acknowledged there are no licensed or approved therapies to address this population

- Ampion has successfully completed two pivotal Phase 3 trials for the signs and symptoms severe OAK
  - Pivotal trial design examined response in pain, function and patient global assessment

- Potential product label addresses pain, function and patient global assessment
  - Clinical results show that treatment with Ampion results in a 71% responder rate in a composite endpoint of pain, function and quality of life

- Ampion is safe and well tolerated and is being developed for both short-term and continuous long-term use
  - Safety supported by single and multiple-injection studies in over 2,000 patients
  - FDA-approved Human Serum Albumin (HSA) is the sole starting material

- Ampion is the first therapy to consistently demonstrate significant, safe and meaningful improvement in all core OAK efficacy measurements for severe OAK

- Ampion is a platform therapy and is anticipated to achieve blockbuster potential in the US



2

# Severe OAK is a serious, debilitating condition with a high unmet need

## Overview of Osteoarthritis of the Knee (OAK)

- OAK is a progressive disease characterized by gradual degradation and loss of cartilage due to inflammation of the soft tissue and bony structures of the knee joint
  - Symptoms include pain, swelling, stiffness, and limited mobility or function

- ~21M people in the US are currently diagnosed with OAK
  - 1 in 2 Americans is expected to develop symptomatic OAK in their lifetime
  - Prevalence has increased rapidly in recent years and is anticipated to continue growing due to aging population and rise in obesity

- Progression to the most severe form of osteoarthritis leaves OAK patients with little to no treatment options other than total knee arthroscopy (TKA)
  - Severe OAK is defined as KL 4
  - FDA acknowledged an unmet need for severe OAK patients due to limited treatment options and reliance on costly TKA

## Stages of OA
**(Kellgren Lawrence)**



**KL Grade 1**
Minimum disruption



**KL Grade 2**
Joint-space narrowing. The cartilage begins breaking down. Occurrence of osteophytes

**Unmet Need**



**KL Grade 3**
Moderate Joint-space reduction Gaps in the cartilage can expand until they reach the bone



**KL Grade 4**
Joint-space greatly reduced. 60% of the cartilage is already lost. Large osteophytes are present

*Osteoarthritis Epidemiology Report. DataMonitor, Inc. 2013. 4 Relationship between patient-reported disease severity in osteoarthritis and self-reported pain, function and work productivity. Sadosky et al. Arthritis Research & Therapy 2014.*



3

A high need exists to more effectively manage patients, who have no treatment options with demonstrated efficacy, prior to, or prolonging, progression requiring TKA

| | Mild OAK | Moderate OAK | Severe OAK |
|---|---|---|---|
| **1st Line** | • Non-pharmacological intervention (physical therapy)<br>• Oral analgesics<br>• Topicals | • Oral analgesics<br>• Topicals | • Opioids<br>• IA injections (hyaluronic acid or corticosteroid)* |
| **2nd Line** | • NSAIDs<br>• Non-selective NSAIDS<br>• COX-2 inhibitors | • NSAIDs<br>• Non-selective NSAIDS<br>• COX-2 inhibitors | **Treatment Gap** |
| **3rd Line** | • Opioids<br>• Intra-articular (IA) injections (hyaluronic acid or corticosteroid) | • Opioids<br>• IA injections (hyaluronic acid or corticosteroid) | • Surgery (total knee arthroplasty, TKA) |

*Have not shown clinical efficacy in severe OAK*

*"We acknowledge the unmet medical need for patients with severe osteoarthritis of the knee. We are willing to work with you and provide advice for future development"* – FDA Minutes Feb. 2017

**Ampion is positioned to address the strong dissatisfaction with current treatment options with FDA acknowledgement of an unmet medical need to better treat and manage severe patients**

*Crichton B, Green M. GP and patient perspectives on treatment with non-steroidal anti-inflammatory drugs for the treatment of pain in osteoarthritis 2002, EULAR Recommendations 2003: an evidence based approach to the management of knee osteoarthritis: Report of a Task Force of the Standing Committee for International Clinical Studies Including Therapeutic Trials (ESCISIT) 2003, Campbell Alliance commercial assessment, LW Analytics*

Ampio
PHARMACEUTICALS

# IA injections are a mainstay of managing moderate OAK but are limited by poor efficacy and long-term safety and have not been evaluated for severe (KL4) patients

| Common Treatment Options Used for Severe OAK | Pain Reduction in Severe (KL 4) OAK | Functional Improvement | Long-Term Use | Concerns & Limitations |
|---|---|---|---|---|
| **Hyaluronic Acid IA Injection** | ✖ | ✖ | • Diminishing efficacy observed after repeat injection | • Varying evidence of efficacy<br>• Not recommended by AAOS |
| **Corticosteroid IA Injection** | ✖ | ✖ | • Cartilage loss observed to be greater vs. placebo long-term | • JAMA study did not show sig. pain improvement vs. saline<br>• Risk of infection if used prior to TKA |
| **Opioids** | ✖ | ✖ | • Not recommended for long-term use | • Addiction<br>• Side effects |
| **Ampion** | ✔ | ✔ | • Safe and well tolerated for repeat injection | • None |

## Ampion is the only therapy to demonstrate both pain and function efficacy in severe OAK patients

*GP and patient perspectives on treatment with non-steroidal anti-inflammatory drugs for the treatment of pain in osteoarthritis 2002; EULAR Recommendations 2003: an evidence based approach to the management of knee osteoarthritis: Report of a Task Force of the Standing Committee for International Clinical Studies Including Therapeutic Trials (ESCISIT). Drug Approval Label, Campbell Alliance primary research; AAOS 2016 annual meeting*



# In addition to not having demonstrated effect in severe OAK, recent guidance recommends against the use of intra-articular corticosteroids and HA

## Corticosteroids



- May 2017 study from Tufts Medical Center and Boston University School of Public Health

- Intra-articular triamcinolone led to **significantly higher cartilage volume loss compared with saline**
  - Mean change in index compartment cartilage thickness (-0.21mm vs -0.10 mm)

- There was **no significant difference in pain severity** between saline and triamcinolone groups

- Research concludes results **do not support use of triamcinolone** for individuals with symptomatic OAK

## Hyaluronic Acid



- AAOS official guidelines Recommendation 9
  - "We **cannot recommend using hyaluronic acid** for patients with symptomatic osteoarthritis of the knee."

- Strength of recommendation: Strong
  - **Recommendation based on lack of efficacy**
  - Implications of a strong recommendation state that physicians should follow unless a clear and compelling rationale of alternative approach

- Rationale is backed by three high-strength and 11 moderate-strength studies

*JAMA Original Investigation: Effect of Intra-articular Triamcinolone vs saline on Knee Cartilage Volume and Pain in Patients with Knee Osteoarthritis, a Randomized Clinical Trial, Sponsor: Tufts Medical Center Clinical Trials.gov Identifier:  NCT01230424 / American Academy of Orthopedic surgeons*



## As a result of limited efficacy of existing treatments, patients ultimately require total knee arthroplasty (TKA)

### Overview of TKA Burden

- Over 700k TKAs are performed each year in the US
  - TKA is anticipated to continue growing at a rapid pace to over 3.5M procedures by 2030
  - Aging patient population and increasing obesity rates have resulted in growing OA prevalence and severity

- TKA procedures fail or are revised often, and are associated with high cost
  - 12% of TKA procedures will require revision within 10 years of implant
  - Further, 10-34% of TKA patients experience chronic knee pain, functional disability, poor quality of life and dissatisfaction after surgery[5]

- Surgical risk for TKA patients is high given age and frequent comorbidities such as obesity and diabetes

### Expected US TKA Procedures (2017-2030)



**13.2%** CAGR

**FDA recognized a high unmet need to treat severe OAK patients and limit progression to TKA**
**Ampion is currently conducting an extension of its pivotal study to evaluate time to TKA**

*Projections of primary and revision hip and knee arthroplasty in the United States from 2005 to 2030, 2007 / Revision rates after total joint replacement: cumulative results from worldwide joint register datasets 2011 / UptoDate / Revision rates after total joint replacement Journal of Bone & Joint Surgery,2011 5. Persistent pain after total knee or hip arthroplasty: differential study of prevalence, nature, and impact 6. Total knee replacement: is it really an effective procedure for all? 2007 / Risks and Complications of Total Knee Replacement Surgery Healthline 2015 / The Increasing Financial Burden of Knee Revision Surgery in the United States 2006*



7

# Failure to adequately treat severe OAK patients has resulted in a large and growing economic burden due to TKA

## Economic Burden of Total Knee Arthroplasty (TKA)



Total cost of hospital expenditures due to TKA*

## $35 Billion



Total charges per TKA patient (hospitalization, implant, fee)

## $49,500



Total charges per TKA revision surgery (12% within 10 years)

## $74,000

**Ampion is well positioned to target patients prior to TKA and potentially delay surgical intervention, filling a key treatment gap left by existing therapies with diminishing efficacy and long-term safety issues**

*Methodology: (Total charge per TKA patient) X (Number of TKA Procedures)

*The Direct and Indirect Costs to Society of Treatment for End-Stage Knee Osteoarthritis, 2013 / http://www.healthline.com/health/total-knee-replacement-surgery/understanding-costs#1 / The Economic Burden of OA, 2009, 5.The Increasing Financial Burden of Knee Revision Surgery in the United States 2006*

Ampio
PHARMACEUTICALS

8

# Physicians identify a significant need in severe OAK – Ampion is well positioned to address this treatment gap



## Need for improved efficacy in moderate/severe patients

**Pain reduction**:
- Conflicting evidence to support pain reduction benefit of IA hyaluronic acid and corticosteroids
- Diminishing pain reduction after repeat injection limits ability to manage patients long term

**Functional improvement**:
- Current therapies have not demonstrated an ability to improve function, range of motion, etc.

*"There is a lot of room for improvement as the **current therapies for severe OAK patients are not very good**. The patients lack cartilage and **viscosupplements tend not to relieve pain**."*

*- Rheumatologist*



## Need for improved quality of life
- Limited evidence to support quality of life or patient global assessment improvement with existing therapies
- Anecdotal evidence shows some marginal short-term improvement following IA injection due to lubricating effect, however such benefit is varied and diminishes quickly
- Moderate/severe OAK patients have significant quality of life impact and often have limited mobility, function, and inability to work

*"I have been suffering with incapacitating pain that has significantly altered my quality of life and limited my physical ability. I tried injections that didn't work and my orthopedic doctor told me my only option was a knee replacement. At 62, I was often walking with a cane."*

*- Severe OAK Patient*



## Need a safe treatment for long-term use

**No addiction potential**:
- Despite effective pain management with opioids, high-addiction risk limits use

**No long-term adverse events**:
- Corticosteroid IA injections have shown greater cartilage degradation vs. saline from long-term use
- Significant side effects associated with chronic opioid use

*"I spend the majority of my practice time in surgery replacing both knees and hips. Unfortunately my post-treatment care deals almost exclusively with opioid addiction because **I have nothing to give these patients while they are waiting for knee replacement**."*

*-Orthopedist*



9

Results of 10 orthopedist, 7 rheumatologist and 3 pain management specialist interviews conducted by Campbell Alliance in 10/2013

# AMPION™

**A first-in-class, injectable biologic for the treatment of the signs and symptoms of severe OAK**

**A low molecular-weight filtrate of FDA-approved Human Serum Albumin (HSA)**





## Ampion is a first-in-class, injectable biologic treatment for the signs and symptoms of severe OA of the knee and has successfully completed two pivotal studies

- Ampion is a low molecular weight (<5 kDa) ultra filtrate of 5% commercial human serum albumin for the treatment of signs and symptoms of severe OAK
  - Single 4mL intra-articular injection with demonstrated efficacy at 12 weeks in multiple clinical studies
- Ampion is the first drug to demonstrate significant reduction in pain as well as improvement in function and patient global assessment in severe OAK
- Ampion has successfully completed two pivotal studies required for BLA submission:
  - ✓ **AP-003-A (Phase 3 single injection)** – single dose of Ampion demonstrated statistically significant pain reduction vs. saline at 12 weeks across all OAK severities
    - "*Upon review of the dataset received on November 5, 2013, FDA concludes that Study AP-003-A can be considered as one of the two 'pivotal' trials required in support of a BLA.*" – FDA Minutes Nov. 2013
  - ✓ **AP-003-C (Phase 3 single injection)** – single dose of Ampion demonstrated statistically significant effect and met primary endpoint with 71% of patients meeting OMERACT-OARSI responder criteria
    - AP-003-C serves as a second statistically significant pivotal study for BLA submission
- Ampio has a clear path to approval and incorporated FDA guidance when designing AP-003-C to maximize regulatory and commercial success
- Novel MOA of Ampion biologic reduces pain signaling, inflammation and is involved in the promotion of healing
- Safe and well tolerated with no drug-related serious adverse events
  - Most common AE's include: arthralgia injection site pain, headache, joint stiffness

### Throughout its clinical development history, Ampion has demonstrated:

| | | |
|---|---|---|
| ✓ **Consistent patient outcomes across all trials** | ✓ **Safe and well tolerated** | ✓ **High relative efficacy in severe patients** |



11

## Ampion has completed two pivotal studies required for FDA filing as well as several additional studies supporting efficacy as both a single and repeat injection

| | Study | Design |
|---|---|---|
| **Pivotal Studies** | **AP-003-A** Phase 3, n=329 (Mar 2013 - Aug 2013) | • **Endpoint**: WOMAC A pain reduction at 12 weeks compared to saline<br>• **Single IA injection**<br>  – 4 mL, 10 mL Ampion vs. 4 mL, 10 mL Saline |
| | **AP-003-C** Phase 3, n=168 (Jun 2017 - Dec 2017) | • **Endpoint**: OMERACT-OARSI responder rate at 12 weeks >30%<br>• **Single IA injection**<br>  – 4 mL Ampion vs. 4 mL saline at ratio of 6:1 |
| **Supportive** | **AIK** Phase 1/2b (May 2011- Apr 2012) | • **Endpoint**: WOMAC A pain reduction at 12 weeks<br>• **Single IA injection**<br>  – 4 mL Ampion<br>  – 4 mL saline |
| | **AP-004** Phase 3 (Jan 2014- Jun 2014) | • **Endpoint**: WOMAC A pain reduction at 12 weeks<br>• **Single IA injection**<br>  – 4 mL Ampion vs. 4 mL saline |
| | **AP-007** Phase 2 (Jun 2014- Feb 2015) | • **Endpoint**: WOMAC A pain reduction at 20 weeks<br>• **Multiple IA injections**<br>  – 4 mL Ampion vs. 4 mL saline<br>  – IA injections (3 total) administered on day 0, week 2, and week 4 |
| | **AP-008** Phase 3 (Oct 2014- Apr 2015) | • **Endpoint**: WOMAC A pain reduction at 20 weeks<br>• **Multiple IA injections**<br>  – 4 mL Ampion vs. 4 mL saline<br>  – IA injections (3 total) administered on day 0, week 2, and week 4 |
| | **AP-003-B** Phase 3 (Sept 2015- Jun 2016) | • **Endpoint**: WOMAC A pain reduction at 12 weeks<br>• **Single IA injection**<br>  – 4 mL Ampion vs. 4 mL saline |

### FDA Guidance

- FDA (CBER division) requires 2 pivotal trials in support of a BLA submission

- FDA designated AP-003-A as a pivotal trial in support of a BLA for Ampion
  – Primary endpoint was reduction in pain compared to saline control at 12 weeks

> *"We accept the results of Study AP-003-A as one of the two phase 3 trials required to support a BLA."*
> *– FDA Minutes July 2015*

- Recent AP-003-C study serves as the second pivotal trial in support of BLA
  – Primary endpoint was OMERACT-OARSI response against 30% meaningful threshold
  – Secondary endpoints included a composite endpoint of pain and function (OARSI 'controlled' responder), PGA response and comparison to historic saline

**Ampion has demonstrated safety and efficacy in 2,007 patients across seven clinical trials and has completed two pivotal trials required for BLA submission**

WOMAC A pain scale for all studies; NRS pain scale used in AIK. P-values based mean change of primary endpoint as defined in the protocol. / Bar-Or, et al. A randomized clinical trial to evaluate two doses of an intra-articular injection of LMWF-5A in adults with pain due to osteoarthritis of the knee. Plos One. 2014 Feb; 9(2). / Schwappach, et al. Preliminary trial of intra-articular LMWF-5A for osteoarthritis of the knee. Orthopedics. 2017 Jan 40(1).

# In its first statistically significant pivotal study, AP-003-A, Ampion demonstrated reduction of pain across all OAK severities



**AP-003-A: Reduction of WOMAC A Pain by Severity**

**FDA has provided confirmation that AP-003-A can be used as
one of two pivotal studies for BLA approval of a single injection therapy**



13

## AP-003-C's OARSI response primary endpoint differentiates Ampion's label to include 'signs and symptoms' as a result of demonstrated effect on all key OAK endpoints

- **Existing therapies approved for OAK are labeled for the "treatment of pain"** due to inability to demonstrate improvements in function or patient quality of life

- OMERACT-OARSI outlines responder status, which **assesses symptomatic parameters of WOMAC A pain, WOMAC C function, and PGA quality of life** and provides a composite analysis

    - OMERACT-OARSI responder was validated using data driven and expert opinion methodology that evaluated over 10,000 OA patients
    - AP-003-C utilized OMERACT-OARSI as the primary endpoint of the study
    - Additionally, AP-003-C evaluated a composite of pain and function, OARSI "controlled" responder, that required improvement in both pain and function in Criteria 2 of the response criteria, against both a meaningful threshold and a historic saline control

| OARSI Response Criteria | Criteria 1 | or | Criteria 2 |
|---|---|---|---|
| **WOMAC A Pain** | ≥ 50% Reduction   *1 of 2* | | ≥ 20% Reduction   *2 of 3* |
| | *or* | | *or* |
| **WOMAC C Function** | ≥ 50% Improvement | | ≥ 20% Improvement |
| | | | *or* |
| **Patient Global Assessment** | - | | ≥ 20% Improvement |
| | *and* | | *and* |
| **Likert Pain Score (5pt, 0-4)** | ≥ 1.0 Pt Reduction | | ≥ 0.5 Pt Reduction |



14

# AP-003-C successfully met its primary endpoint demonstrating statistically significant OARSI response vs. 30% threshold; provided Ampio its second successful pivotal study



## Ampion Efficacy for Primary and Secondary Endpoints of AP-003-C

**OARSI Response**
**Primary Endpoint**
**p < 0.001**

71%*

**OARSI Controlled Responder**
**p < 0.001**

65%*

**PGA Responder**
**p < 0.001**

66%*

**Controlled Responder vs. Historic Saline**
**p < 0.001**

65%*

43%

*30% threshold of clinically significant difference*

Reduction/Improvement in Endpoint

Ampion   Ampion   Ampion   Ampion   Saline

## Ampion is the first therapy to demonstrate significant improvement of the signs and symptoms of severe OAK patients

Ampion n=144; Saline n=208. $\geq$1.5 pain and function score for KL 4 patients required for eligibility in analysis for 'signs and symptoms' per FDA. Eligible saline patients across historic single-injection studies included in analysis.



15

In addition, AP-003-C Ampion demonstrated statistically significant effect across all OAK core efficacy measurements against historical saline controls



### AP-003-C Supportive Data – Ampion vs. Historical Saline Controls

Ampion n=144; Saline n=208. $\geq$1.5 pain and function score for KL 4 patients required for eligibility in analysis for 'signs and symptoms' per FDA. Eligible saline patients across historic single-injection studies included in analysis.



16

# AP-003-C and AP-003-A provide two statistically significant clinical trials for BLA submission that demonstrate significant effect on pain and core OAK measurements



**Ampion demonstrated consistent, durable pain reduction vs. saline throughout the 12 week treatment period**

AP-003-C: Ampion n=144; Saline n=208. AP-003-A: Ampion n=31 Saline n=41.  ≥1.5 pain and function score for KL 4 patients required for eligibility in analysis for 'signs and symptoms' per FDA. Eligible saline patients across all single-injection studies included in analysis.

**Ampio**
PHARMACEUTICALS

17

# Ampion has consistently demonstrated significant OARSI response across all trials that exceed minimum clinically meaningful threshold



## OMERACT-OARSI Responder Analysis

## Takeaways

- Analysis of all patients shows a 64% combined response rate, which consistently and significantly exceeds 30% responder status threshold for clinical trial in support of BLA approval

- Physicians and KOLs agreed that a 30% threshold of responders is clinically meaningful and relevant to their practice

- OARSI response for AP-003-A, AP-004, and AP-003-B based on post-hoc analysis

*"Ampion is a safe and effective treatment and is something I would offer to my patients. Especially because I have no predictable option for patients with advanced OAK."*                    —Orthopedist

**Ampion has consistently demonstrated improvement of the signs and symptoms in severe OAK patients**



18

≥1.5 pain and function score required for eligibility in analysis for 'signs and symptoms' per FDA

# Ampion has a robust safety profile with no drug-related SAE's recorded for 2,007 clinical patients

| Adverse Event | KL 4 | | All KL Grades | |
|---|---|---|---|---|
| | Ampion (n=494) | Saline (n=338) | Ampion (n=1084) | Saline (n=923) |
| **One or more AE** | 196 (39.7%) | 152 (45.1%) | 449 (44.3%) | 408 (45.8%) |
| **One or more related AE** | 28 (5.7%) | 16 (4.7%) | 63 (9.2%) | 53 (5.9%) |
| **AE by severity** | | | | |
| Mild | 95 (19.2%) | 66 (19.6%) | 224 (22.1%) | 193 (21.7%) |
| Moderate | 79 (16.0%) | 70 (20.8%) | 183 (18.1%) | 181 (20.3%) |
| Severe | 22 (4.5%) | 16 (4.7%) | 42 (4.1%) | 34 (3.8%) |
| Serious AE (SAE) | 7 (1.4%) | 7 (2.1%) | 47 (4.6%) | 41 (4.7%) |
| **AE leading to death** | 0 | 0 | 0 | 1 (0.1%) |

- 2,007 patients have participated in Ampion clinical trials (including single-injection and multiple-injection studies), and have demonstrated a robust safety profile of Ampion
  - No drug-related Serious Adverse Events (SAEs)
  - Adverse Event (AE) profile similar for saline and Ampion
  - Majority of AEs were of minor or moderate severity and were unrelated to treatment

**Ampion is safe and well tolerated and is suitable for both short-term and continued long-term treatment**

Ampio
PHARMACEUTICALS

19

**An Open Label Extension (OLE) continuation of the pivotal study is underway to support an expanded commercial label with repeat administration of Ampion**

- Ampion is safe and well-tolerated, which has been demonstrated in all patients

  - Sole starting material is FDA approved HSA, which has over 60 years of demonstrated safety

- To comply with FDA guidance for industry, an Open Label Extension (OLE) study from the recent pivotal trial is currently underway

  - OLE study offers patients an opportunity to receive repeat injections after completion of the pivotal trial

  - OLE study will address the regulatory requirements to allow an expanded commercial label for repeat administration of Ampion up to 5 doses per year

  - Additionally, the OLE study will explore delay of TKA under protocol

Ampio

PHARMACEUTICALS

20

# Ampio shows strong potential for disease-modifying activity through novel anti-inflammatory and immunomodulation mechanisms as well as stem cell differentiation

## Novel anti-inflammatory and immunomodulation profile

- Ampion reduces ongoing joint damage while promoting healing
  - Ampion exhibits a unique immunomodulatory pattern compared to steroids and NSAIDS
  - Ampion upregulates COX2 expression



Proinflammatory cytokines (TNFa)    Healing-promoting prostaglandins

## Stem cell activation and differentiation

- Ampion has the potential to regenerate damaged joint tissue
  - Ampion significantly increased the formation of filopodia in mesenchymal stem cells
  - Ampion triggered morphological changes suggestion differentiation in chondrogenic cultures



*Stem cell mobilization*



*Stem cell differentiation*

**Multiple mechanisms in Ampion create the potential for disease-modifying activity in OAK and may help delay the time to TKA**



21

## Ampion will be the first and only treatment indicated to address this unmet need

✓ First therapy to be approved and indicated for severe OAK patients

✓ Demonstrates clinically meaningful improvement in pain and function and quality of life

✓ Meaningful impact improving stiffness

✓ Lasting pain relief with 12-week efficacy after single dose

✓ Safe and well tolerated

✓ Appropriate for short-term and long-term use supported by safety and efficacy demonstrated in the single-injection and multiple-injection studies

✓ Consistently strong, response with OMERACT-OARSI composite endpoint

✓ Potential to delay or eliminate need for TKA

*"My patients have no other options. My experience and the AAOS have found all other pharmacological agents to be wanting. This product has been shown across multiple studies to be safe and effective."*          *-Orthopedist*



22

# Given high unmet need in moderate and severe OAK, physician research suggests Ampion has the potential to achieve blockbuster status in the US



**Prevalence of OAK**
**21M**

**60%** | **Treated/Seen by Specialist**
**12.4M**

**69.4%** | **Moderate & Severe OAK**
**8.6M**

**12.4%** | **Ampion Patients**
**1.1M**

**$600 3x/Yr** | **Total Ampion Gross Revenue Potential**
**$1,900M**

*References*
Campbell Alliance report
Note: Ampion market share has been adjusted for prescribing habits by specialty (ortho, rheum, pain med), severity (mod/sev), reflect share steal and concomitant use from/with IA steroids and hyaluronic acid, and have been adjusted for access and reimbursement status
Pricing assumes $600 per treatment, 3 treatments per patient per year



23



**The mechanism of action of Ampion may be applied to other inflammatory indications, such as:**

- Other joints (hip, shoulder, wrist, hand, etc.)

- Sports injuries

- Systemic inflammatory conditions

- Breathing disorders

   *\* Drug delivery method varies by indication*

Ampi<sub></sub>o
PHARMACEUTICALS

24

# Ampio will receive 12 years biologic exclusivity and is also protected by a robust IP portfolio with international coverage

## Worldwide Patent Coverage



| Region | Issued Patents (127) | Pending Patent Applications (80) |
|--------|---------------------|----------------------------------|
| US | 17 | 9 |
| Ex-US | 110 | 71 |

### Countries with Patent Protection Granted



| U.S. Patent Portfolio (17) | 2000 | 2005 | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|---|---|
| BLA Exclusivity (expected) | | | | | 2H 2018 – 2H 2030 | | |
| Patent Term Extension (Capped by 14 year limit) | | | | | Approval – 2H 2032 | | |
| Inflammation (U.S. 8,916,568) | | 2001 – 2021 | | | | | |
| Filtrate (U.S. 8,183,209) | | | 2004 – 2024 | | | | |
| Degenerative Joint Disease (U.S. 8,980,834) | | | | 2012 – 2032 | | | |

## FDA Protections

- **FDA deemed Ampion a "novel biologic", which grants 12 years of exclusivity upon approval under the Biologics Price Competition and Innovation Act of 2009 (BPCIA)**

## Composition of Matter

- **US 8,916,568 (Inflammation family)**
- **US 6,555,543 (Inflammation family)**
- **US 8,183,209 (Filtrate family)**
- **US 8,969,308 (Filtrate family)**
- **US 8,962,568 (Filtrate family)**

## Method of Use/Treatment

- **US 6,555,543 (Inflammation family)**
- **US 8,268,830 (Inflammation family)**
- **US 8,513,196 (Filtrate family)**
- **US 8,980,834 (Degenerative joint disease family)**
- **US 9,060,968 (Degenerative joint disease family)**
- **US 9,623,072 (Degenerative joint disease family)**



25

# Ampion manufacturing enables control over operational process and cost for market entry and commercialization

- **De-risk regulatory process**
  - Facilitate FDA filing with direct manufacturing process experience
  - Facility has undergone independent inspection
  - Ampion process presented at International Society for Pharmaceutical Engineers



- **Improves manufacturing control and position for market entry**
  - Control of manufacturing and release of product
  - Production capacity of 7-8 million vials/year from single site

- **High margins**
  - Low cost of goods
  - Affords pricing flexibility

**Control over Ampion manufacturing, release, and quality output creates commercial value**



## Conclusion

- Ampion™ is a novel biologic set to address an unmet medical need and significant treatment gap in severe osteoarthritis of the knee (OAK)
  - FDA acknowledged there are no licensed or approved therapies to address this population
- Ampion has successfully completed two pivotal Phase 3 trials for the signs and symptoms severe OAK
  - Pivotal trial design examined response in pain, function and patient global assessment
- Potential product label addresses pain, function and patient global assessment
  - Clinical results show that treatment with Ampion results in a 71% responder rate in a composite endpoint of pain, function and quality of life
- Ampion is safe and well tolerated and is being developed for both short-term and continuous long-term use
  - Safety supported by single and multiple-injection studies in over 2,000 patients
  - FDA-approved Human Serum Albumin (HSA) is the sole starting material
- Ampion is the first therapy to consistently demonstrate significant, safe and meaningful improvement in all core OAK efficacy measurements for severe OAK
- Ampion is a platform therapy and is anticipated to achieve blockbuster potential in the US



27

Exhibit D

On August 7, 2018 Ampio filed an 8-K with the SEC attaching an Updated Business Disclosure.

EX-99.1 2 tv500347_ex99-1.htm EXHIBIT 99.1

*EXHIBIT 99.1*

### Updated Business Disclosure

### Regulatory Update

As a pharmaceutical company that operates in the United States, we are subject to extensive regulation by the FDA and other federal, state, and local regulatory agencies. The Federal Food, Drug, and Cosmetic Act, or the FD&C Act, the Public Health Service Act and FDA's implementing regulations set forth, among other things, requirements for the testing, development, manufacture, quality control, safety, effectiveness, approval, labeling, storage, record keeping, reporting, distribution, import, export, advertising and promotion of our product candidates. Although the discussion below focuses on regulation in the United States, because that is currently our primary focus, we anticipate seeking approval for, and marketing, our products in other countries in the future. Generally, our activities in other countries would be subject to regulation that is similar in nature and scope as that imposed in the United States, although there can be important differences.

With respect to FDA review of Ampion and our completed and ongoing clinical trials, including the AP-003-A and AP-003-C trials, we have been and expect to continue to be engaged in meetings and correspondence with the FDA about the product, its manufacturing, and the preclinical and clinical testing necessary to support Ampion's safety and efficacy. We met with the FDA in July 2018 and have received a letter in response thereto. In the letter, the FDA stated that it considers the AP-003-A trial to be an adequate and well-controlled clinical trial that provides evidence of effectiveness of Ampion and can contribute to the substantial evidence of effectiveness necessary for approval of a BLA, but that as a single trial the AP-003-A study alone does not appear to provide sufficient evidence of effectiveness to support a BLA. Despite our belief that the APC-003-C trial design was based on FDA guidance and feedback and consistent with FDA precedent for similar products (in intended use, in origin, and in regulatory pathway), which we reiterated with the FDA multiple times, the FDA does not consider the AP-003-C trial to be an adequate and well-controlled clinical trial. The FDA recommended that we perform an additional randomized trial with a concurrent control group and that we request a Special Protocol Assessment to obtain FDA concurrence of the trial design before beginning the study. We plan to continue to discuss with the FDA the necessity of conducting this additional trial, as we believe the current body of data is sufficient to submit the BLA.

Ampio will also continue to address with the FDA the validation of manufacturing processes and controls for the submission of a BLA for Ampion.

### Forward-Looking Statements

Our statements above that are not historical fact, and that relate to future plans or events, are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements can be identified by the use of words such as "believe," "expect," "plan," "anticipate," and similar expressions. These forward-looking statements include statements regarding our expectations with respect to Ampion™ and its classification, as well as those associated with regulatory approvals and other FDA decisions, including whether the FDA will require another trial, the Biologics License Application (BLA), to clinical trials and decisions and changes in business conditions and similar events, all of which are inherently subject to various risks and uncertainties. The risks and uncertainties involved include those detailed from time to time in our filings with the Securities and Exchange Commission, including without limitation, under Ampio's Annual Report on Form 10-K and other documents filed with the Securities and Exchange Commission. We undertake no obligation to revise or update these forward-looking statements, whether as a result of new information, future events or otherwise.